UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
KEITH TURNER,

                Plaintiff,

        - against -

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
-------------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
12-CV-02259 (CBA)

AMON, Chief United States District Judge.

       Plaintiff Keith Turner has petitioned for review of the Commissioner's denial of disability insurance benefits. The parties have cross-moved for judgment on the pleadings. Having reviewed the ruling of the Administrative Law Judge ("ALJ"), the record, and the parties' submissions, the Court finds that the ALJ's determination that Turner was not disabled was amply supported by the record and not based on any errors of law. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Turner's motion is denied.

## BACKGROUND

       Turner sought disability benefits on the basis of lower back pain. (See Administrative Transcript, Docket Entry 18 ("Tr.") at 132 (disability report listing injuries as "[b]ack and neck injuries").) The ALJ, however, also considered whether Turner's sleep apnea or broken foot qualified as severe impairments. (Tr. 10.) Turner's complaint in this case only alleges that he was entitled to receive disability benefits because of his "severe back injury" (Compl. ¶ 4); however, in his memorandum of law, Turner briefly argues that the ALJ also erred in failing to adequately address his sleep apnea (Pl. Mem. at 11), a contention he also pursued at oral argument. Turner does not argue before this Court that his foot injury rendered him disabled.

1

## I. Non-Medical Evidence

Turner was born in 1966, and completed high school and three years of college. (Tr. 22, 56.) He worked from 1994 through 2000 as a school custodian, and from 2000 through 2007 as a crew chief for an environmental cleaning firm. (Tr. 24.) In August 2007, while working at the environmental cleaning firm, Turner twisted his back while climbing down a ladder. (Tr. 24, 188.) Turner testified that he was fired the next day, and that he sought Workers' Compensation for the injury, but never received it. (Tr. 24.)

After suffering the injury in 2007, Turner sought treatment from two doctors, Dr. Surendranath K. Reddy and Dr. David M. Idank. (Tr. 154-69, 188-93.) Both doctors, after examining Turner, initially found that he was totally disabled, and prohibited him from working until after a reevaluation. (Tr. 163, 190.) On November 15, 2007, after receiving an MRI report that principally revealed very mild posterior disc bulging without a significant compressive effect (Tr. 197), Dr. Idank returned Turner to regular work (Tr. 193). Dr. Reddy continued to prohibit Turner from working through December 22, 2007. (Tr. 158.)

Turner thereafter was hired to work in sales by a fire and water damage restoration company. (Tr. 25.) Turner worked there for approximately one year, ending in April 2009. (Id.) Turner testified that he was fired from the job because he was not "able to make it to work most of the time" due to his inability to wake up in the morning (id.); in his disability report, however, he stated that he was "laid off because of lack of work" (Tr. 132 (capitalization omitted)). Turner has not worked since.

In his disability report, Turner claimed that he was disabled due to "[b]ack and neck injuries," and that those injuries caused him to be unable to work because he was "unable to lift and carry heavy objects, unable to bend," and had "limited motion." (Tr. 132 (capitalization

omitted).) Turner's disability report did not mention any other alleged disability. In his hearing testimony, Turner testified that he has back pain when doing certain activities, such as lifting more than twenty pounds or sitting for too long. (Tr. 30, 32-33.) He testified that if he sits for more than fifty minutes, he gets discomfort and has to switch positions, and that he usually addresses the problem by lying down. (Tr. 32-33.) Turner testified that he was seeing Dr. Onyemachi G. Ajah for his various medical problems, and that Dr. Ajah had prescribed him medication to address the back pain. (Tr. 28-29.)

During the July 27, 2010 hearing, Turner mentioned several other medical problems, including sleep apnea, breathing difficulties, and a fracture of his right foot that occurred while working in his garden in May 2010. Turner testified that he was taking Ambien and using a continuous positive airway pressure mask (a "CPAP") to address his sleep apnea. (Tr. 26.) Turner testified that "[t]he Ambien helps," but that the CPAP was not helping, and that he was in the process of getting a "dental device" to try to address his sleeping issues. (Tr. 26-27.) He stated that he had been treated by Sleep Diagnostics of New York, Inc. ("Sleep Diagnostics") "approximately a dozen times" since January 2010. (Tr. 27.) Turner briefly mentioned his breathing difficulties, informing the ALJ that Dr. Ajah was treating his breathing problems, and that he had been told he might have asthma. (Tr. 29.) With regard to his foot injury, Turner testified that since breaking his foot he was only able to stand for approximately twenty to thirty minutes or walk for one block before feeling a stabbing pain. (Tr. 31-32.)

In order to avoid the pain associated with his injuries, Turner testified that he spends most of the day lying down (Tr. 35), and testified that because he cannot stand for long periods of time, his sister cooks for him, her children clean his room, and a friend does his shopping and laundry (Tr. 36). He also stated that although he climbed the three stories to his apartment four

3

or five times per day, he sometimes found it necessary to crawl up the stairs. (Tr. 21.) He was able to drive short distances (Tr. 34), and he testified that before he broke his foot he was "very active" and would run "six, seven miles . . . every other day" (Tr. 36). Turner also testified that medication helped relieve the pain. (Tr. 37.) At the time of the hearing, he had no income, although he had previously been receiving unemployment benefits for approximately one year. (Tr. 23.)

## II. Medical Evidence

### A. Medical Treatment Prior to April 13, 2009 (Alleged Onset Date)

After Turner suffered his injury in August 2007, he was seen by both Dr. Reddy and Dr. Idank. During his initial visit to Dr. Reddy on September 10, 2007, Turner told Dr. Reddy that he was suffering from aching lower back pain shooting down the right leg, hip, and thigh, with tingling, numbness, and weakness. (Tr. 154.) Dr. Reddy prohibited Turner from work activity until reevaluation. (Tr. 163.) Upon reevaluation with Dr. Reddy on October 10, 2007,[1] Turner tested positive on the Milgram's and Kemp's tests; a motor exam found weakness in the right hamstring, soleus, and tibialis anterior muscles; a sensory exam found pinprick hypoesthesia; and a test of deep tendon reflexes found diminished right ankle jerk reflexes. (Tr. 156.) Dr. Reddy diagnosed Turner with traumatic paralumbar myofascitis with radiculopathy, and rule out lumbar disc herniations. (Tr. 157.) He found that Turner was totally disabled, and recommended that Turner continue physical therapy until his reevaluation in four weeks. (Id.) The record indicates that on November 24, 2007, Dr. Reddy subsequently extended Turner's prohibition from working until December 22, 2007. (Tr. 159.)

Turner first saw Dr. Idank for an initial examination on October 24, 2007. At that visit, a

---

[1] The record indicates that, in the interim, another certificate of disability was signed on September 20, 2007, by another doctor at Dr. Reddy's practice. (Tr. 165.)

lumbar exam found decreased flexion and extension with pain; other tests were largely normal. (Tr. 189.) Dr. Idank diagnosed Turner with low back pain with right sciatica, found that he was totally incapacitated, and prohibited him from working. (Tr. 168, 189-90.) Dr. Idank examined Turner again on November 14, 2007, and noted that Turner reported that the symptoms had largely stayed the same and that physical therapy had not helped. (Tr. 191.) Dr. Idank found that his condition was largely normal, and diagnosed him with lumbar pain. (Tr. 191-92.) He ordered continued physical therapy, and continued to restrict him from work. (Tr. 192.) The next day, however, Dr. Idank received Turner's MRI report, which was largely normal except for mild bulging in one area. (Tr. 193.) Based on the report, Dr. Idank returned Turner to regular work duty and told him that continued therapy was unnecessary. (Id.)

### B. Medical Treatment After April 13, 2009

On May 27, 2009, after Turner filed the benefits claim at issue in this case, he returned to Dr. Idank for an examination of low back and neck pain. (Tr. 194.) Turner reported that the symptoms had worsened, and described the pain as "sharp" and "worsened by lying and lifting." (Id.) Turner also stated that he was having difficulty sleeping and waking up in the morning. (Id.) Dr. Idank's examination found no irregularities, and he diagnosed Turner with chronic low back pain. (Tr. 195.) He did not find any indication of a disability, and thus did not place Turner on any work restrictions. (Id.) Dr. Idank saw Turner again on June 17, 2009; he subsequently wrote that Turner had reached his "maximal medical improvement," and that "further treatment would be considered palliative for control of pain." (Tr. 196.)

On July 1, 2009, Dr. Yinggang Zheng performed a consultative orthopedic examination of Turner. (Tr. 221-23.) Turner rated his pain as five-out-of-ten, and told Dr. Zheng that it was aggravated by walking and activity, and partially relieved with rest and pain medication. (Tr.

221.) Turner told Dr. Zheng that he cooks twice a week, but does not do cleaning, laundry, or shopping because of his low back pain. (Id.) Dr. Zheng's examination found that Turner had a full range of motion and normal levels of strength, and Dr. Zheng diagnosed him with low back pain. (Tr. 222-23.) Dr. Zheng opined that Turner was "mildly limited for walking, standing, climbing, lifting, squatting, and bending," and that he had no limitations related to his upper extremities. (Tr. 223.)

During the time period at issue, Turner regularly saw Dr. Ajah, a general practitioner, about his various health problems. (Tr. 235-45.) The earliest notes from Dr. Ajah in the record are from August 12, 2009, when Turner visited Dr. Ajah for his back pain. (Tr. 241.) Turner informed Dr. Ajah that he was feeling better with his medications, sleeping better, and that his back pain had subsided. (Id.) A physical exam found lumbar spinal spasm and mild local tenderness, but that Turner was "comfortable" and "not in acu[te] distress." (Id. (capitalization omitted).) Dr. Ajah diagnosed backache, insomnia, and hypercholesterolemia. (Id.)

Turner saw Dr. Ajah again on December 10, 2009, December 23, 2009, January 19, 2010, April 22, 2010, and June 17, 2010. During the December 10, 2009 visit, Turner stated that he was continuing to have back pains, and informed Dr. Ajah that he had a sleep test conducted the previous day. (Tr. 242.) He also complained of heartburn that wakes him up at night. (Id.) Dr. Ajah diagnosed esophageal reflux, backache, and obstructive sleep apnea. (Tr. 243.) He prescribed medication – Nexium and Percocet – and told Turner to return in two weeks. (Id.) At the December 23 follow-up visit for Turner's insomnia, Turner reported "feeling fine" and that he was taking his medication. (Tr. 239 (capitalization omitted).) Dr. Ajah diagnosed insomnia and backache. (Tr. 240.) During a January 19, 2010 follow-up visit, Turner again reported "feeling fine," and was diagnosed with insomnia, obstructive sleep apnea, and backache. (Tr.

6

237-38 (capitalization omitted).) Dr. Ajah prescribed Ambien and Percocet. (Tr. 238.) Dr. Ajah did not report any muscular abnormalities at any of these visits.

On April 22, 2010, Turner visited Dr. Ajah complaining about a cough and difficulty breathing. (Tr. 235.) In addition to addressing Turner's breathing difficulties, Dr. Ajah noted that Turner had lumbar spinal region muscular spasm and mild local tenderness. (Id.) Dr. Ajah diagnosed him again with backache, as well as with asthma and allergic rhinitis, and prescribed medication to address the breathing difficulties. (Tr. 236.) Finally, on June 17, 2010, after his foot injury, Turner visited Dr. Ajah regarding his foot and back pain. (Tr. 244.) Turner informed Dr. Ajah that his pain in his foot was getting better, and that his back pain was worse when he runs out of medication. (Id.) Dr. Ajah noted no muscular problems and diagnosed Turner again with backache. (Id.) Dr. Ajah noted that Turner should "cont[inue] weight bearing as tolerated." (Id. (capitalization omitted).) Other than this statement, Dr. Ajah never recommended during any of Turner's visits that Turner should avoid engaging in certain activities or suggested that he might be disabled.

In addition to his visits to Dr. Ajah, Turner was also treated by Dr. Urmila Shivaram of Sleep Diagnostics. On December 9, 2009, Dr. Shivaram diagnosed Turner with severe obstructive sleep apnea, and recommended that Turner "[a]void situations requiring sustained vigilance," such as driving. (Tr. 256.) Turner underwent a follow-up sleep study on December 21, 2009; Turner had an "[e]xcellent response" to a CPAP, and Dr. Shivaram recommended that he use the mask to treat his sleep apnea. (Tr. 259.) Although Turner testified at his hearing that he was seen at Sleep Diagnostics approximately a dozen times (Tr. 27), no other evidence related to his visits is included in the record.

Finally, on December 22, 2009, Turner saw Dr. Arthur H. Tiger for an examination

7

related to the reopening of his Workers' Compensation claim. (Tr. 254-55.) Dr. Tiger reported that Turner stated that his back had gotten worse, and that he had pain radiating down to his right knee. (Tr. 254.) Turner was unable to "squat, kneel, turn or twist to the degree that he did before," and stated that he "fe[lt] more limited than he has previously," that he could not sleep, and that he had difficulty doing any heavy lifting. (Id.) The examination found moderate loss of the usual lumbar lordotic curvature, and areas of trigger point tenderness on both sides of the lower lumbar spine. (Id.) Dr. Tiger also found tenderness to palpitation over the L2, L3, L4, and L5 vertebral spinal processes, and that pressure over certain joints caused pain to radiate into both buttocks and the right hamstring. (Id.) There were losses of terminal degrees of flexion, extension, lateral bend, and lateral rotation of the lumbar spine, and a positive straight leg rising to seventy-five degrees. (Id.) Dr. Tiger diagnosed chronic lumbosacral strain syndrome with chronic myofascitis with elements of a lumbar radiculopathy. (Tr. 255.) As a result, he concluded that Turner had "a disability of 37½% of partial total." (Id.)

Also included in the administrative record are several documents indicating visits made by Turner to hospitals. On December 29, 2009, Turner visited the emergency department of Jamaica Hospital Medical Center, complaining of atypical chest pain. (Tr. 247.) He was prescribed Ambien for insomnia, and told to return to work in two days. (Id.) Another document indicates that he was discharged from the podiatry department at Jamaica Hospital Medical Center on June 1, 2010, presumably after seeking medical treatment for his broken foot. (Tr. 246.) Finally, Turner visited the Wyckoff Heights Medical Center emergency room on June 7, 2010, and was told on discharge to follow up with podiatry. (Tr. 253.)

### C. Expert Testimony

An administrative hearing was held on July 27, 2010, before Administrative Law Judge

Sol A. Wieselthier. Dr. Donald Goldman testified at the hearing after reviewing Turner's medical records and listening to his testimony. Dr. Goldman concluded, based on the evidence, that Turner had a lower back injury that was initially treated in 2007. (Tr. 40-41.) He noted, however, that the 2007 MRI only identified a very mild disc bulge, and did not show any problems that would influence the range of motion. (Tr. 42.) Because the MRI did not indicate any severe impairment, Dr. Goldman looked to the clinical examinations, concluding that, because the treating physicians did not repeatedly find atrophy, weakness, or other limitations, there was no permanent injury indicated by objective medical evidence. (Tr. 42-43.) Dr. Goldman acknowledged Dr. Tiger's findings to the contrary, but questioned them at length: He testified that Dr. Tiger's report was incomplete because it lacked evidence about atrophy and weakness, and suggested that it should be discounted because it was inconsistent with the rest of the record. (Tr. 46, 50.) Dr. Goldman also addressed Dr. Tiger's conclusion that Turner had a 37.5% partial disability, noting that Dr. Tiger's conclusion was based on the Workers' Compensation guidelines and that it equated to "roughly a moderate disability." (Tr. 46.) Largely due to the lack of clear objective measures indicating any disability, Dr. Goldman concluded that Turner did not suffer from an impairment that would prevent him from working. (Tr. 44.)

Dr. Goldman also briefly testified about Turner's broken foot, noting that such an injury typically would not last longer than six or eight weeks. (Tr. 45.) Dr. Goldman was not asked about, and did not address, Turner's sleep apnea or asthma.

### III. Vocational Expert Testimony

Vocational expert Pat Green testified at the administrative hearing. (Tr. 52-59.) She testified that Turner's past work consisted of skilled work at a medium exertion level as an

environmental crew cleaner, semiskilled work at a medium exertion level as a janitor, and skilled work at a light exertion level as a sales service promoter. (Tr. 52-55.) When asked by the ALJ, Green testified that she believed that, if Turner were found to have a residual functional capacity for light work, he would be able to perform his past work in sales. (Tr. 55.) Likewise, a finding that he could perform heavy or medium work would allow him to perform his previous jobs as a janitor or environmental cleaner. (Id.) Finally, when asked by the ALJ what work would be available if he was found to be limited to sedentary work, Green testified that, based on Turner's claimed limitations, he would be unable to perform any of his past relevant work, but could perform other jobs, such as a parimutuel ticket checker, where he could sit or stand at various times. (Tr. 57-59.)

**IV. The ALJ's Decision**

On August 16, 2010, the ALJ denied Turner's application for disability benefits. (Tr. 8-15.) The ALJ found that Turner had not been engaged in substantial gainful activity since April 13, 2009, and that he had a severe impairment, namely, low back pain. (Tr. 10.) The ALJ determined, however, that the low back pain did not meet the qualifications of any disability listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P of the Regulations. (Tr. 11.) The ALJ also found that neither Turner's sleep apnea nor broken foot was a severe impairment. The ALJ found that the sleep apnea did not qualify because Turner had testified that Ambien helped address it, and that Turner's broken foot would not last the twelve months necessary to qualify as a disability. (Tr. 10.)

Although the low back pain was determined to be a severe impairment, the ALJ found that Turner had the residual functional capacity to do light work, and that he therefore could perform his past relevant work as a sales service promoter. (Tr. 11, 14.) In determining Turner's

10

residual functional capacity, the ALJ found that Turner's statements regarding "the intensity, persistence and limiting effects" of his symptoms were not credible. (Tr. 11.) The ALJ detailed and reviewed the medical reports from Dr. Zheng, Dr. Tiger, and Dr. Ajah (noting that Dr. Ajah was the "treating physician"), and recapped Dr. Goldman's testimony that the record did not contain any objective findings of an impairment, "accept[ing] the opinion of Dr. Goldman, due to his expertise in the field of orthopedics and its consistency with the evidence of record." (Tr. 12-13.) The ALJ also noted Turner's testimony about his daily life activities, including his ability to ascend three flights of stairs regularly (albeit sometimes by crawling), his ability to use public transportation, and his athletic activities prior to the recent foot injury. (Tr. 12.) The ALJ concluded that the evidence in the record failed to support Turner's claim that "his back condition rendered him totally disabled," noting that his allegations of pain were "not consistent with the degree of treatment," that his strength was consistently graded at 5/5, and that the 2007 MRI did not show any significant findings. (Tr. 13-14.) Therefore, considering that "[t]he record lacks objective and clinical findings to document the presence of an impairment," that Turner "has not received treatment for his back for the past two years," that "his pain medication helps to relieve his pain," and that he "testified to engaging in normal activities prior to hurting his foot, not his back," the ALJ concluded that he was capable of engaging in light work activity. (Tr. 14.)

Based on the finding that Turner could engage in light work activity, the ALJ concluded that Turner was not disabled, crediting Green's testimony that a person who could engage in light work activity would be able to perform Turner's past relevant work in sales. (Id.) Therefore, Turner's claim for benefits was denied. (Tr. 15.) Turner sought review of the ALJ decision by the Appeals Council, which denied his request for review, making the ALJ's order

the final decision of the Commissioner. (Tr. 1-3.) Turner then filed this action on May 8, 2012, claiming that he is entitled to disability benefits because of his "severe back injury." (Compl. ¶ 4.)

## DISCUSSION

"In reviewing the Commissioner's denial of benefits, the courts are to uphold the decision unless it is not supported by substantial evidence or is based on an error of law." Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999); see also Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (the Commissioner's conclusions must be affirmed unless they are not "supported by substantial evidence in the record as a whole or are based on an erroneous legal standard" (internal quotation marks omitted)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

### I. Evaluating Disability Under the Social Security Act

Under the Social Security Act, an individual is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step analysis to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1520. The Commissioner first determines whether the claimant is working; if he is engaging in

12

substantial gainful activity, the claim will be denied without consideration of any medical evidence. 20 C.F.R. § 404.1520(a)(4)(i), (b). If the claimant is not working, the Commissioner determines whether the claimant has a severe impairment that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.1521. If the claimant is found to have such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment or combination of impairments that meets or equals one of the listings in Appendix 1 to 20 C.F.R. Part 404, Subpart P of the Regulations; if so, the claimant will be found disabled with no further inquiry. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 404.1525, 404.1526.

If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. 20 C.F.R. §§ 404.1520(a)(4)(iv), (f), 404.1560(b). To determine the claimant's residual functional capacity, the Commissioner must consider all of the claimant's impairments, not just those deemed severe. 20 C.F.R. §§ 404.1520(e), 404.1545(a); Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184 (July 2, 1996). If the Commissioner finds that his residual functional capacity is sufficient for the claimant to perform past relevant work, the claimant will be found not disabled and his claim denied.

If the claimant's residual functional capacity does not permit him to engage in his prior work, or if the claimant does not have any past relevant work, the fifth and final step requires the Commissioner to determine whether the claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." Decker v. Harris, 647 F.2d 291, 298 (2d Cir. 1981); see 20

13

C.F.R. § 404.1520(a)(4)(v), (g). The burden falls on the Commissioner to establish that there is gainful work in the national economy that the claimant could perform. See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004). If no such gainful work in the national economy exists, the claimant will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v).

## II. Turner's Backache as a Disability

Turner argues that the ALJ erred in finding that his back pain did not amount to a disability. Turner challenges the determination that he had the residual functional capacity to do light work, advancing three primary arguments: that the ALJ failed to properly apply the treating physician rule; that the ALJ erred in his assessment of Turner's credibility; and that the ALJ failed to provide an adequate basis for the finding that Turner was capable of performing light work.

### A. The Properly Applied the Treating Physician Rule

Turner argues that the ALJ erred in not giving conclusive weight to Dr. Tiger's findings regarding his limitations. (See Pl. Mem. at 7-9.) It is well-settled that "[t]he opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." Selian, 708 F.3d at 418; see also 20 C.F.R. § 404.1527(c)(2). If a treating source is not given controlling weight, "the Commissioner must 'give good reasons in his notice of determination or decision for the weight he gives [the claimant's] treating source's opinion.'" Botta v. Barnhart, 475 F. Supp. 2d 174, 187 (E.D.N.Y. 2007) (quoting Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)). Failure to give good reasons is grounds for remand. See Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); Botta, 475 F. Supp. 2d at 187.

A treating physician is a claimant's "own physician, psychologist, or other acceptable

medical source who provides [claimant], or has provided [claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [claimant]." 20 C.F.R. § 404.1502. An ongoing treatment relationship exists when the evidence demonstrates that the claimant has seen the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [claimant's] medical condition(s)." Id. "Doctors who see a patient only once or twice do not have a chance to develop an ongoing relationship with the patient, and therefore are not generally considered treating physicians." Lacy v. Astrue, No. 11-CV-4600, 2013 WL 1092145, at *13 (E.D.N.Y. Mar. 15, 2013) (internal quotation marks omitted). Generally, a medical source is not considered a treating physician if the claimant's relationship with the source is not based on a "medical need for treatment or evaluation," but instead only on the "need to obtain a report in support of [claimant's] claim for disability." 20 C.F.R. § 404.1502. Although the opinion of a consultative doctor can nevertheless be considered by an ALJ, the fact that a single consultant disagrees with a treating physician whose opinion is otherwise supported by substantial evidence does not justify failing to give the treating physician's opinion controlling weight. See Rankov v. Astrue, No. 11-CV-02534, 2013 WL 1334085, at *9 (E.D.N.Y. Mar. 30, 2013.) Moreover, the Second Circuit has cautioned that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." Selian, 708 F.3d at 419.

Turner argues that the ALJ failed to follow the treating physician rule by failing to give controlling weight to Dr. Tiger's opinions regarding the severity of Turner's symptoms, including Dr. Tiger's ultimate conclusion that Turner had "a disability of 37½% of partial total" (Tr. 254-55). The ALJ, however, was not required to give controlling weight to Dr. Tiger's determinations because Dr. Tiger was not Turner's treating physician. Although Dr. Tiger's

notes suggest he examined Turner on a previous occasion (see Tr. 254 (noting that "Turner returned to [his] office")), the fact that Turner visited Dr. Tiger on one or two occasions is insufficient to suggest an ongoing treatment relationship, see Lacy, 2013 WL 1092145, at *13. Furthermore, the record makes clear that Dr. Tiger examined Turner solely in a consultative role at the request of Turner's attorney for the purpose of Turner's attempt to reopen his Workers' Compensation claim. (See Tr. 254 (addressing the report to Turner's attorney and noting that it was a "reopening examination").) There is no indication that Dr. Tiger provided any treatment to Turner; as such, the ALJ was not required to accept his opinion as conclusive.

By contrast, the ALJ's residual functional capacity determination was entirely consistent with the findings of Turner's two treating physicians, Dr. Idank and Dr. Ajah. Dr. Idank found in May 2009 that Turner's condition was largely normal, absent some mild discomfort reported during the lumbar exam. (Tr. 194-95.) Dr. Idank had no treatment recommendations beyond additional acupuncture, and found no indication of any disability or need for work restrictions. (Tr. 195.) Dr. Ajah, who regularly treated Turner after the alleged onset date, diagnosed nothing more than a "backache" on most of Turner's visits; on two occasions he also noted that Turner had "lumbar spinal region muscular spasm" and "mild local tenderness." (Tr. 235, 241 (capitalization omitted).) Neither doctor ever opined, after Turner's alleged onset date, that he was in any way limited or disabled because of his condition. The ALJ's determinations were entirely consistent with these findings. The ALJ found that Turner's back problems were in fact a severe impairment, taking into account the doctors' conclusions indicating that he was in some amount of pain. However, because neither of Turner's treating doctors suggested that his back problems limited his movement or interfered with his ability to function, the ALJ's conclusion that Turner could engage in light work activity was entirely consistent with the opinions of those

physicians.

## B. The ALJ Did Not Err in Assessing Turner's Credibility

Turner also argues that the ALJ erred in discrediting his testimony regarding his symptoms. It is the function of the Commissioner, not this Court, "to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted). This Court reviews an ALJ's credibility decisions only to determine whether they are supported by substantial evidence. Id. "[A] finding on the individual's credibility with regard to symptom descriptions is acceptable when . . . it includes precise reasoning, is supported by evidence in the case record and makes clear, both to the individual and to any subsequent reviewers, the weight the adjudicator gave the claimant's statements and the reasons for that weight." Snyder v. Barnhart, 323 F. Supp. 2d 542, 547 (S.D.N.Y. 2004).

20 C.F.R. § 416.929(c)(3), as interpreted by SSR 96-7P, 1996 WL 374186 (July 2, 1996), requires an ALJ to follow a two-step process in evaluating a claimant's testimony regarding his symptoms. First, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms." Id. at *2. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Id. The ALJ must also consider evidence beyond the objective medical evidence, including

> 1.The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than

treatment the individual uses or has used to relieve pain or other symptoms . . . ; and 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id. at *3; see also Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (ALJ need not "accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record").

The ALJ correctly followed the required process in evaluating Turner's credibility, and the determination that Turner's descriptions of his symptoms were not credible was adequately supported by the record evidence. As required by the regulations, the ALJ first found that Turner's "medically determinable impairment could reasonably be expected to cause the alleged symptoms." (Tr. 11.) Nonetheless, the ALJ determined that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible" (id.), considering the objective medical evidence available in the case and the record as a whole. The ALJ found that Turner's allegation "that his back condition rendered him totally disabled" was "not supported by the evidence in the record," noting that

> the allegations of pain are not consistent with the degree of treatment. Claimant was never hospitalized for back pain. As testified to by Dr. Goldman, throughout the record strength was graded 5/5, which was within normal limits. MRI of 2007 does not show any significant findings. On the contrary, the report shows very mild posterior disk bulging without a significant compressive effect. There is no quantitative evidence of any significant motor loss with muscle weakness and sensory and reflex loss along appropriate radicular distribution. The record lacks objective and clinical findings to document the presence of an impairment, which would preclude claimant from engaging in work related activities. Additionally, claimant testified that he has not received treatment for his back for the past two years; his pain medication helps to relieve his pain and [he] testified to engaging in normal activities prior to hurting his foot, not his back. As a matter of fact, claimant testified that he injured his foot working in the garden.

(Tr. 13-14.)

The ALJ's conclusion with regard to Turner's credibility is amply justified. As the ALJ noted, the record is littered with reports of normal exam results, including medical evidence suggesting that Turner had normal strength, lacked motor loss, and did not have any significant trigger sensitivity. Furthermore, Turner himself repeatedly told his treating physicians that he was "feeling fine" (Tr. 237, 239) and that his medication was helping (Tr. 241). Although Turner claimed to be in a substantial amount of pain during his consultative visit to Dr. Tiger, Dr. Ajah's notes from the very next day contain no references to any complaints of pain. (Tr. 239, 254.) Thus, the ALJ did not err in finding that Turner's allegations of pain were inconsistent with the medical evidence.

After finding that Turner's reported symptoms were not substantiated by objective medical evidence, the ALJ also properly considered the record as a whole in order to assess the credibility of Turner's allegations of pain. Noting that Turner admitted that he had not received treatment for the back pain for two years, that he testified that medication helped his back pain, and that he claimed to have engaged in normal physical activities after hurting his back but prior to hurting his foot, the ALJ concluded that Turner's claims about his symptoms were not credible. (Tr. 14.) Although the fact that Turner can perform routine daily activities does not, without more, contradict his claims about the limiting effects of his back pain, see, e.g., Larsen v. Astrue, No. 12-CV-00414, 2013 WL 3759781, at *3 (E.D.N.Y. July 15, 2013) (noting that "[a]n individual can perform" daily activities and "still experience debilitating pain" with limiting effects), the testimony elicited by the ALJ demonstrated that Turner could lift up to twenty pounds for extended periods of time without pain (Tr. 30), drove for short distances and took public transit (Tr. 34), and was "very, very active" prior to the foot injury, even running for six

or seven miles every other day (Tr. 36).[2] That testimony, along with Turner's admission that his medication helped the back pain (Tr. 37-38), is entirely consistent with the objective medical evidence in the record indicating that Turner was not disabled, and inconsistent with Turner's claim that he was in so much pain as to be completely unable to work. Because "[t]he notes of [Turner's] treating physicians provide substantial evidence for the ALJ" to make a credibility determination, Shriver v. Astrue, No. 07-CV-2767, 2008 WL 4453420, at *2 (E.D.N.Y. Sept. 30, 2008), and because Turner's testimony largely undermined his allegations regarding his symptoms, it was not error for the ALJ to discredit Turner's claims regarding the extent of his pain.

## C. The ALJ's Residual Functional Capacity Determination Was Supported by Substantial Evidence

Finally, Turner argues that the ALJ did not provide an adequate basis for his finding that Turner had the residual functional capacity to perform light work. The Court rejects this argument, as the ALJ adequately based his decision on the substantial record evidence indicating that Turner's impairment only minimally limited his ability to function. Both treating physicians found no substantial evidence of any impairment, and Dr. Goldman, the medical expert, testified to his opinion that the record contained no objective findings suggesting that Turner's back problems interfered with his capacity to function in any significant manner. (Tr. 41-42, 44.) Furthermore, the ALJ explicitly considered the findings of the two consultative doctors who found that Turner was, to some degree, limited by his back injury—Dr. Zheng and Dr. Tiger.

---

[2] At oral argument, Turner's attorney suggested that, when he mentioned his athletic activities, Turner was referring to the time period before his back injury in 2007. (Oral Argument Transcript at 24-28.) Although there was subsequently some confusion regarding the time frame at issue, Turner's response was to a question specifically about the time period before May, when the foot injury occurred. (Tr. 36.) It is therefore clear that Turner was discussing his activities prior to May 2010. Even if, however, Turner was referring to the time period prior to his back injury, the ALJ's credibility determination was still well-supported by the rest of Turner's testimony and the other evidence in the record.

(Tr. 12-13.)  To the extent that the ALJ gave less weight to the opinions of those doctors, that determination was entirely reasonable, as neither doctor was a treating physician and substantial other evidence in the record suggested that Turner was not significantly impaired by his injury. In any event, the ALJ's conclusion was largely consistent with the medical findings of Dr. Zheng and Dr. Tiger.  The ALJ concluded that Turner's backache was indeed a severe impairment, essentially accepting Dr. Tiger's findings that Turner had experienced some loss of motion and increased tenderness.  Furthermore, the ALJ's finding that Turner could engage in light work activity was consistent with Dr. Zheng's conclusion that Turner was "mildly limited" in performing certain activities (Tr. 223), and Dr. Tiger's conclusion that Turner had a partial disability (Tr. 255).

The nonmedical evidence in the record does not contradict this determination.  The ALJ found that Turner was capable of performing light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," or "a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).  Even with his alleged pain, Turner was able to drive, take public transportation, sit for fifty minutes without any pain, lift twenty pounds without pain, and engage in significant physical activity.  (Tr. 30, 32-36.)  Turner also testified that medication was effective at relieving the pain.  (Tr. 37.)  Although his pain may limit his ability to work, the record is entirely consistent with the ALJ's conclusion that Turner could engage in the full range of activities defined as light work.

Finally, at oral argument, Turner's attorney suggested for the first time that the ALJ's residual functional capacity determination was flawed because the ALJ failed to consider the

21

effect of Turner's asthma on his ability to work.[3] Although an "adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe,'" SSR 96-8P, 1996 WL 374184, at *5, the evidence regarding Turner's asthma is limited at best, and there is no indication in the record that it interfered with his ability to function. The only record evidence regarding Turner's asthma are records of a hospital visit for "[a]typical [c]hest [p]ain" (Tr. 247), and a single visit to Dr. Ajah where he complained of a cough and difficulty breathing (Tr. 235-36). No doctor suggested that he was limited in any manner because of the asthma, and Turner never suggested, either before the ALJ or at oral argument before this Court, how the asthma affected his functional abilities. There is no reason to believe that explicit consideration of Turner's asthma would have changed the ALJ's determination; as such, the failure of the ALJ to explicitly consider Turner's breathing difficulties in determining his residual functional capacity was not error.

Considering the totality of the evidence in the record, the ALJ's determination that Turner could engage in light work activity was entirely supported by the evidence. The ALJ's finding that Turner's back pain was not a disability must therefore be affirmed.

### III. Tuner's Sleep Apnea as a Disability

#### A. Forfeiture

Turner argues that the ALJ also erred in failing to properly consider whether his sleep apnea was a severe impairment. Turner, however, has not properly raised that issue as a basis for

---

[3] Turner's counsel, however, disavowed any argument that the asthma was itself a severe impairment limiting Turner's ability to work; rather, Turner only argued that the asthma should be considered as an additional factor in determining his residual functional capacity. (See Oral Argument Transcript at 10.) Even if Turner were to now claim that the asthma itself was a disability, that argument was never presented to the ALJ, and is therefore forfeited. See Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) (claim that ALJ failed to consider obesity as an impairment waived when claimant "never alleged any limitation in function as a result of his obesity in his application for benefits or during the hearing"); Watson v. Astrue, No. 08 Civ. 1523, 2010 WL 1645060, at *3 (S.D.N.Y. Apr. 22, 2010) (failure to raise mental impairment on disability application or during hearing waived the issue).

remanding his case. In his complaint in this action, Turner alleged that "Plaintiff became entitled to receive disability insurance benefits . . . because of the following disability[:] severe back injury." (Compl. ¶ 4.) The complaint nowhere indicates that Turner's intention was to challenge the determination that his sleep apnea was not a severe impairment. Furthermore, Turner's memorandum of law addresses his claim based on sleep apnea in only a single sentence, simply stating that the ALJ "erred in failing in toto to address the issue of [his] sleep apnea and insomnia." (Pl. Mem. at 11.) Because Turner's complaint did not challenge the ALJ's determination with regard to his sleep apnea, and because that issue was only raised in a single sentence in his memorandum of law, he has forfeited that issue, and the Court need not consider it as a basis for remanding the case, see, e.g., Smith v. Astrue, No. 09-422, 2013 WL 3424086, at *24 n.16 (D. Del. July 5, 2013) (finding that argument that ALJ made a particular legal error was waived when it was raised only "in a single sentence in [the] briefing, with no further explanation made regarding this argument in other parts of [the] briefs"); Bergfeld v. Barnhart, 361 F. Supp. 2d 1102, 1110 (D. Ariz. 2005) ("A reviewing federal court will only address the issues raised by the claimant in his appeal from the ALJ's decision."); cf. Boykin v. KeyCorp, 521 F.3d 202, 214 (2d Cir. 2008) (Complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" (internal quotation marks omitted)).

## B. Sleep Apnea as an Impairment

Even if Turner had not forfeited his contention that the ALJ erred in finding that his sleep apnea was not a disability, that argument is meritless. The ALJ found that sleep apnea did not qualify as a severe impairment because Turner had testified that his medication helped with the condition. (Tr. 10.) Although that explanation did not discuss the entirety of the evidence regarding Turner's sleep apnea, the record is clear that Turner's sleep apnea was not a severe

23

impairment that would "significantly limit[ his] physical or mental ability to do basic work activities," 20 C.F.R. § 404.1520(c). See Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982) (affirming ALJ's unexplained determination because court was "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence"). Dr. Ajah treated Turner for sleep apnea on several occasions and, although he diagnosed him with insomnia and obstructive sleep apnea, he never indicated that the condition limited Turner's abilities. (Tr. 235-45.) Furthermore, on at least two occasions, Turner saw Dr. Ajah specifically to address his sleep problems and reported to Dr. Ajah that he was "feeling fine." (Tr. 237, 239.) The record also indicates that, although Turner was diagnosed with obstructive sleep apnea and told to "[a]void situations requiring sustained vigilance" during his initial consultation at Sleep Diagnostics (Tr. 256), he had an "[e]xcellent response" to the CPAP during his second visit, and was not told to refrain from any particular activities (Tr. 259).

In short, although Turner was diagnosed with sleep apnea, there is nothing in the record suggesting that his ability to work was limited by that condition. The only evidence that his sleep apnea interfered with his ability to function was his allegation that he was fired from his job in April 2009 because he was not able to wake up in time for work (Tr. 25), however, is directly contradicted by Turner's Disability Report, in which he claimed he was "laid off because of lack of work." (Tr. 132 (capitalization omitted).) There is simply no indication that Turner's sleep apnea was a severe impairment.

## CONCLUSION

For the above reasons, the Commissioner's motion for judgment on the pleadings is granted, and Turner's is denied. The Clerk of the Court is directed to enter judgment in favor of

the Commissioner and to close the case.

     SO ORDERED.

Dated: Brooklyn, New York
     March 3/ , 2014

                                       s/Carol Bagley Amon

                                      Carol Bagley Amon
                                      Chief United States District Judge